317 So.2d 576 (1974)
GULF OIL CORPORATION
v.
STATE MINERAL BOARD et al.
No. 54776.
Supreme Court of Louisiana.
December 2, 1974.
On Rehearing July 25, 1975.
*577 Henican, James & Cleveland, C. Ellis Henican, Carl W. Cleveland, New Orleans, for Milner Realty Co., Inc., Louis Carmadelle, Jr., and Gustave Carmadelle, defendants-relators.
William J. Guste, Jr., Atty. Gen., Edward M. Carmouche, Charles Romano, Sp. Asst. Attys. Gen., for defendants-respondents *578 State Mineral Bd. and Register of State Land Office.
Arthur D. Mouton, Wm. H. Mouton, Wm. H. Mouton Law Offices, Lafayette, for amici curiae.
Blake G. Arata, John M. McCollam, Gordon Arata, McCollam & Watters, New Orleans, for amicus curiae.
SANDERS, Chief Justice.
Gulf Oil Corporation deposited a substantial sum of money in the registry of the Twenty-Fifth Judicial District Court and instituted a concursus proceeding to determine the true owner of property which it was leasing. The district court rendered judgment in favor of the State Mineral Board and the Register of the State Land Office.
Milner Realty Co., Inc., Louis Carmadelle, Jr., and Gustave Carmadelle appealed. The Court of Appeal affirmed the judgment of the trial court, decreeing the State of Louisiana the owner of certain water bottoms located in Plaquemines Parish and awarding oil royalty payments to the State Mineral Board. 291 So.2d 807. We granted certiorari to review the judgment of the Court of Appeal. La., 294 So.2d 831.
Milner Realty Co., Inc., Louis Carmadelle, Jr., and Gustave Carmadelle, relators, urge that the Court of Appeal erred in holding that the nullity of a patent of navigable water bottoms was not cured by the lapse of six years, pursuant to Act 62 of 1912 (LSA-R.S. 9:5661), which provides:
"Actions, including those by the State of Louisiana, to annul any patent issued by the state, duly signed by the governor and the register of the state land office, and of record in the state land office, are prescribed by six years, reckoning from the day of the issuance of the patent."
The State advances several grounds for affirming the judgment of the Court of Appeal. It argues that the private claimants are precluded from maintaining that the property was the bed of a navigable water bottom at the time of the Sheriff's sale to the original patentee on October 29, 1910, or on the date of the alleged patent, citing State v. Scott, 185 So.2d 877 (La.App. 1st Cir. 1966). In addition, the State asserts that where a portion of the bed of a navigable body of water is adjudicated to the State for taxes, Article 4, Section 2 of the Louisiana Constitution prohibits a redemption. The State also submits that Act 62 of 1912, the prescriptive statute relied upon by the private claimants, is inapplicable to the patent involved in this proceeding. We are of the opinion that the latter argument is well founded.[1]
It is well settled that prescriptive statutes are stricti juris and will not be extended beyond the letter of the law. Foster v. Breaux, 263 La. 1112, 270 So.2d 526 (1972); Coastal States Gas Producing Co. v. State Mineral Board, 199 So.2d 554 (La.App., 3rd Cir. 1967); Hebert v. Spano, 233 La. 813, 98 So.2d 199 (1957); United Carbon Company v. Mississippi River Fuel Corp., 230 La. 709, 89 So.2d 209 (1956); Hayes v. Levy, 81 So.2d 172 (La.App., 2nd Cir. 1955); Meyer v. Parish of Plaquemines, 11 So.2d 291 (La.App., Orl.Cir. 1942); State v. Stewart Bros. Cotton Co., 193 La. 16, 190 So. 317 (1939).
In United Carbon Company v. Mississippi River Fuel Corp., supra, this Court stated:
"It is equally well settled that prescriptive statutes are strictly construed, and the facts of the case must bring the action clearly within the specific provisions of the law sought to be applied."
*579 By its terms, Act 62 of 1912 designates the patents to which it applies as those duly signed by the Governor, duly signed by the Register of the State Land Office, and recorded in the State Land Office. The State points out that the patent here was signed neither by the Governor nor the Register of the State Land Office. Nor was it recorded in the State Land Office.
Although the original patent was unavailable for examination, the certified copy of the patent offered into evidence indicates that the original was signed by the Governor. The original patentee, over the State's objection, confirmed that the original was signed by the Governor, but that it had been destroyed. For purposes of this decision, this Court accepts the relators' allegation that it was signed by the Governor. The patent, however, still does not qualify as a prescriptible patent within the intendment of Act 62 of 1912. There is no evidence that the patent was signed by the Register of the State Land Office. Although the private claimants assert that the original patent was signed by I. S. Haspel, President of the Board of Commissions for the Grand Prairie Levee District, that signature is insufficient to bring it within the terms of the statute. The statute specifies the signature of the Register of State Lands. Admittedly, the essential signature did not appear on the document.
Moreover, the contested patent is not registered in the State Land Office. The patent was given to the State Land Office only four or five years before the present suit. The record reflects that it was accepted as supplemental information.
We conclude that Act 62 of 1912 is inapplicable to the present patent, because it was not signed by the Register of the State Land Office nor duly recorded in the State Land Office.
It follows, therefore, that the lower courts were correct in holding that the State of Louisiana is the true owner of the property leased by the Gulf Oil Corporation.
For the reasons assigned, the judgment of the Court of Appeal is affirmed.
BARHAM, J., concurs in result and assigns reasons.
SUMMERS, J., concurs for the reasons assigned.
SUMMERS, Justice (concurring).
Although the law compels me to concur in the Court's opinion, I cannot fail to note the gross injustice of the law in this case, and, very probably, in many others.
Here the landowners' title derives from a sale by the State to the Grand Prairie Levee District in 1905. On authority of the Board of Commissioners of Grand Prairie Levee District it was sold at Sheriff's sale to Millard C. Baker, who also received title to the same land under Patent No. 104 from the State on March 4, 1911. The patent was promptly recorded in the conveyance records of the parish where the property is located. Several subsequent conveyances ended in vesting title in these landowners. Twice the State divested itself of title, and once it enacted a Statute of Repose to set these titles at rest. La.R.S. 9:5661. See California Co., v. Price, 225 La. 706, 74 So.2d 1 (1954).
Now, almost seventy years after the State issued its patent, signed by the Governor, who caused "the Seal of the State Land Office" to be affixed to that patent, the State is claiming title. The claim is based upon a highly technical deficiency in the patent. Although the patent was signed by the Governor, it was not signed by the "register of the state land office" as the Statute of Repose requires, even though the seal of the Register is affixed. La.R.S. 9:5661.
Significantly, this tardy assertion of rights by the State is made when the property *580 becomes valuable because of oil discovery. All these years the landowners in the chain of title have paid taxes and exercised the rights of ownership.
In my view the State policy here is little less than confiscation. If my colleagues would agree, I would interpret the affixing of the seal of the State Land Office as a substantial compliance with the Statute of Repose.
I respectfully concur.
BARHAM, Justice (concurring).
We granted writs in this case in order to reconsider the decisions in California Co. v. Price, 225 La. 706, 74 So.2d 1 (1954), and State v. Cenac, 132 So.2d 897 (La.App. 1st Cir. 1961), writs refused 241 La. 1055, 132 So.2d 928 (1961). That issue was squarely presented to this Court, and at the time the writ was granted, it was considered to be the dispositive issue. Instead of resolving this important problem, however, the majority has based its judgment on a minor issue of much less significance. I do not disagree with the majority's determination of this minor issue. It is the majority's pretermission of what I consider to be the primary issue in this case with which I take issue. For this reason, I am compelled to concur.
The question of the viability of the Price and Cenac decisions is one of vital importance to the entire state. Many titles are considered to be in jeopardy because of the prevailing feeling of uncertainty as to the eventual outcome of this issue. We owe it to these litigants as well as to potential future litigants to dispose of a question, especially one with such far-reaching ramifications as this one, when it is squarely presented to us. This obligation is not met when, as here, the Court dodges the issue and decides a case on a hypertechnical ground. The function of this Court should be to clarify the law when it is in question; by avoiding a decision on this issue we have instead compounded the existing confusion.
In my opinion, the threshold issue presented for our review, in the context of a reconsideration of the Price and Cenac decisions, is whether the Statute of Repose, Act No. 62 of 1912, affects attempts by the State to grant titles to State-owned navigable water bottoms. I am convinced that the statute was not intended to apply to the case at hand and other similar cases. See concurrence in Carter v. Moore, 258 La. 921, 933, 248 So.2d 813, 817 (1971).
I must respectfully concur.

ON REHEARING
BARHAM, Justice.
The underlying issue in the present litigation is the ownership of the Southwest Quarter (SW ¼) of Section 26, Township 19 South, Range 18 East in Plaquemines Parish. The land in question is in the Grand Bay area and is submerged beneath navigable waterbodies which connect with the Gulf of Mexico. Gulf Oil Corporation, which holds leases to the property from both the private litigants in this case (Milner Realty Company, Inc., Louis Carmadelle, Jr., and Gustave Carmadelle) and the State, provoked this concursus proceeding to distribute to the true owner or owners the funds from mineral production on the disputed property.
The private litigants claim ownership through one Millard C. Baker, who purportedly acquired title to the property by purchasing it at a sheriff's sale held on October 29, 1910, by the Grand Prairie Levee District, which had acquired it from the State in 1905. A provisional deed was issued to Baker on that date and the State issued a patent to the property to him on March 4, 1911.
The private claimants contend that Act No. 62 of 1912, affording the State and *581 private parties six years to challenge patents conveying state lands, cured any defects in their title and vested in their ancestor in title ownership of the navigable water beds in question. To reach this result, the claimants rely upon a line of decisions by this Court, culminating in California Co. v. Price, 225 La. 706, 74 So.2d 1 (1954) on rehearing by a 4-3 majority, and upon State v. Cenac, 132 So.2d 897 (La.App. 1st Cir. 1961), in which this Court divided 4-3 in denying writs. 241 La. 1055, 132 So.2d 928 (1961).
The district court granted judgment for the State. The Fourth Circuit Court of Appeal affirmed that judgment on the basis that the patent in question was issued in 1911, subsequent to Act 215 of 1908, an "Oyster Statute" prohibiting alienation of navigable water bottoms. The Court of Appeal held that the Price decision therefore did not apply and that the 1912 statute of repose did not have the effect of ratifying the title of the private claimants' ancestor. 291 So.2d 807 (1974). We granted writs. 294 So.2d 831 (La.1974).
Reserving judgment on the other arguments presented by the State, this Court, on original hearing, affirmed the judgments of the two lower courts on the narrow ground that, because the 1911 patent did not meet the formal requisites to make applicable the 1912 statute of repose, whatever curative powers that enactment might have had did not extend to the patent through which the private litigants claim. We granted a rehearing to reconsider the basis of our original decision and that reconsideration has led us to conclude that we must decide the broader and more basic issue presented by this litigationthat is, whether the jurisprudence of the Price-Cenac line of cases is controlling here and, if so, whether that line of cases and their holdings that private individuals claiming under state patents own the beds of navigable waters if those patents were not attacked under the provisions of Act No. 62 of 1912 are correct.
We have determined that those cases are in point but we have further concluded that they were based upon erroneous reasoning and must be overruled. We do not reach the conclusion without due deliberation, especially in light of the property interests at stake; but our close scrutiny of the reasoning advanced on both sides regarding the legal justification for private ownership of navigable water bottoms has convinced us that repudiation of the Price rationale is the necessary course to take in this matter.
The original source of law from which we must begin our investigation of this problem is found in six articles of our Civil Code. The first three, La.C.C. arts. 449, 450, and 453, remain substantially unchanged since the original adoption of our code in 1808. According to the commentators in the Projet, the other three, La.C.C. arts. 481, 482, and 483, were adopted in our code of 1825 because it was believed proper to classify the nature of ownership of property since "* * * the distinction of things susceptible of ownership, and those which are not * * * serves as a basis for several provisions of the Code."[1] These last three articles expand and explain the first three provisions.[2] The six articles provide:
"Art. 449. Things are either common or public. Things susceptible of ownership belong to corporations, or they are the property of individuals.
"Art. 450. Things, which are common, are those the ownership of which belongs to nobody in particular, and which all men may freely use, conformably with the use for which nature has intended *582 them; such as air, running water, the sea and its shores.
"Art. 453. Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation; of this kind are navigable rivers, seaports, roadsteads and harbors, highways and the beds of rivers, as long as the same are covered with water.
"Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads, and harbors.
"Art. 481. Things, in their relation to those who possess or enjoy them, are divided into two classes; those which are not susceptible of ownership and those which are.
"Art. 482. Among those which are not susceptible or ownership, there are some which can never become the object of it; as things in common, of which all men have the enjoyment and use.
"There are things, on the contrary, which, though naturally susceptible of ownership, may lose this quality in consequence of their being applied to some public purpose, incompatible with private ownership; but which resume this quality as soon as they cease to be applied to that purpose; such as the high roads, streets and public places.
"Art. 483. Things susceptible of ownership, are all those which are held by individuals, and which may be alienated by sale, exchange, donation, prescription or otherwise."
These articles establish, in effect, that certain property designated common or public is held by the State and is neither alienable nor susceptible of private ownership, while other property can be owned by anyone and is not subject to restrictions on its alienability. The redactors of our 1808 and 1825 Codes were aware, when they included these articles in our law, that in France, public things, such as navigable rivers and their beds, are part of the public domain (domanialite public). Such things are governed by a regime entirely different from that governing private law ownership (propriété privée), for property in the public domain is held by the State not in its proprietary capacity, but for the benefit of all the people. 2 A. Yiannopoulos, Civil Law Treatise, Property § 31 at 86 et seq. (1967). [Hereinafter cited as Yiannopoulos.] One of the characteristics of property in the public domain is that it cannot be alienated by the State.
Although the Code neither provides an exclusive listing of inalienable property nor classifies as public navigable waters other than rivers, the jurisprudence has recognized that, by analogy to navigable rivers, navigable water bottoms other than rivers are public things insusceptible of private ownership.[3] Yiannopoulos § 32, at 90 et seq.; Milne v. Girodeau, 12 La. 324 (1838); Louisiana Navigation Co., v. Oyster Commission, 125 La. 740, 51 So. 706 (1910); State v. Bayou Johnson Oyster Co. 130 La. 604, 615, 58 So. 405, 409 (1912); State v. Richardson, 140 La. 329, 72 So. 984 (1916); Roussel v. Grant, 14 Orl.App. 57 (1917); State ex rel. Board of Commissioners of Atchafalaya Basin Levee Dist. v. Capdeville, 146 La. 94, 83 So. 421 (1919); State ex rel. Saint v. Timothy, 166 La. 738, 117 So. 812, 813 (1928); Comment, Alluvion and Dereliction in Lakes, 7 Tul.L.Rev. 438 (1933); Comment, Ownership of Beds of Navigable Waters, 30 Tul.L.Rev. 115 (1955).
Moreover, when the water bottom in question lies, as in this case, under the sea *583 or an arm of the sea, it is explicitly included among the inalienable things vested in the State.
In Miami Corporation v. State, 186 La. 784, 812, 173 So. 315, 324 (1937), this Court noted that private ownership of the beds of navigable waters is forbidden by and "* * * contrary to the whole spirit of the Code * * *." We then held that "* * * [i]t is the rule of property and of title in this State, and also a rule of public policy that the State, as a sovereignty, holds title to the beds of navigable bodies of water." 173 So. at 322.
Further evidence of the strong public policy against private ownership of navigable water bodies embodied in the Civil Code articles is found in a series of legislative enactments, recognizing explicitly or implicitly that such property is owned by the State as inalienable public things. The first enactment of this type was Act No. 247 of 1855, which recognized that if any of the lands acquired through Acts of Congress of 1849 and 1850 contained navigable waters, the land under these waters would not be subject to sale along with swamp and overflow land that were to be sold. Next, Act No. 124 of 1862 recognized that the bottoms of navigable lakes were insusceptible of private ownership by providing that once natural causes rendered dry the beds of navigable lakes, they became "swamp lands" and were susceptible of alienation. One authority has noted that these two statutes reveal that the legislature in 1855 and 1862 was keenly aware of the prior existence of the public policy of the State that the beds of navigable waterbodies are inalienable and insusceptible of private ownership. J. Madden Federal and State Lands in Louisiana 331 (1973) [hereinafter cited as Madden].
Moreover, in formulating Act No. 75 of 1880, the legislature did not enunciate as specific a recognition of public policy as it had in the two previous statutes, but it did excercise extreme caution in providing that the lands it authorized to be sold were only those received by the State under the Swamp Land Acts of 1849 and 1850. This specific restriction evinces an intent to make certain that inalienable water beds were excluded, in recognition of the public policy emanating from the Civil Code. See Madden, at 331. Additionally, Act No. 24 of 1862 assimilated dried up navigable lakes to swamplands and removed the prohibition against alienating such lands.
In 1886, the first of the Oyster Statutes was passed by the legislature (See Act No. 106 of 1886, Act No. 110 of 1892, Act No. 121 of 1896, Act No. 153 of 1902, Act No. 52 of 1904, Act No. 189 of 1910, Act No. 54 of 1914, Act No. 139 of 1924 and Act No. 67 of 1932). Each of these enactments provided that the beds of certain navigable waterways near the Gulf of Mexico shall be, continue and remain the property of the State of Louisiana. Likewise, Act No. 258 of 1910 affirmed that the right to ownership of the beds of all navigable streams is vested in the State.
Thus, legislative action through the course of a century repeatedly acknowledged and reaffirmed the Code and jurisprudential rule of property and public policy that the beds of navigable waters are owned by the State in its sovereign capacity and that these beds could not be alienated by the State. Assuming for the moment that the legislature could have overridden its own prior legislation and the jurisprudence construing that legislation by an explicit conveyance of a navigable waterbottom to a private individual, the statute books are devoid of any such alienation and of any authorization to a state official to alienate such property. On the contrary, each successive act reveals a constant reiteration of extant policy whenever the opportunity presented itself. Finally, the people of the State elevated the long-standing rule of public policy to the dignity of a constitutional provision in adoptiong Art. IV, § 2 of the 1921 Constitution, which removes from the legislature any power it may have *584 had to "* * * alienate, or authorize the alienation of, the fee of the bed of any navigable stream, lake or other body of water, except for purposes of reclamation. * * *" This is restated in the Louisiana Constitution of 1974 in Art. IX, § 3.
Nonetheless, during the period between the enactment of the Civil Code of 1808 and the adoption of the 1921 Constitution, state officials conveyed large blocks of land to private citizens by means of patents. For instance, many private claimants received under State patent tracts of swampland previously ceded to the State by the federal government under the Swampland Acts. The private claimants in this case trace their title to the land in question to a state patent issued to their predecessor in title under authority of Act No. 24 of 1898 and Act No. 27 of 1904, conveying certain lands from the State to the Grand Prairie Levee District and empowering the District to dispose of such land as it should deem proper. Within the geographical boundaries recited in many of these patents lie navigable bodies of water; the issue to be resolved is whether the patents or any subsequent acts of the legislature did convey, or indeed, could have conveyed any navigable water bottoms to private individuals.
It is generally conceded that, by virtue of the legislation and jurisprudence previously discussed and the public policy that they evidence, the state officials empowered to issue patents had no authority to convey the beds of any navigable waters. The private litigants in this case so concede and the majority decision on rehearing in the Price case, which we overrule today, clearly recognized this fact:
"* * * Hence, as stated in the Miami decision, the bottoms or beds of navigable waters are public things within the contemplation of our Civil Code and it is contrary to the policy expressed therein to permit private interests to own them. * * *" 74 So.2d at 11.
However, this Court in Price and in Humble Oil & Refining Co. v. State Mineral Board, 223 La. 47, 64 So.2d 839 (1953) upon which it relied,[4] and the First Circuit Court of Appeal in State v. Cenac, 132 So.2d 897 (1961), concluded that the private landowners in those cases had acquired title to the beds of navigable waters by virtue of Act No. 62 of 1912. The majority on rehearing in Price said:
"Hence, it follows that, inasmuch as the Legislature had the right to authorize the issuance of a patent to the submerged lands, it was likewise empowered to subsequently ratify the action of the Governor and Register of the State Land Office in granting such a patent. And this, we found in our original opinion, is exactly what the Legislature did by the enactment of Act No. 62 of 1912." (Emphasis added). 74 So.2d at 11.
Thus, the dispositive issue before the Court in this case, as in Price, is the effect of Act No. 62 of 1912 and that issue resolves itself primarily into a question of statutory interpretation. In pertinent part, Act No. 62 reads as follows:
"* * * [A]ll suits or proceedings of the State of Louisiana, private corporations, partnerships or persons to vacate and annul any patent issued by the State of Louisiana, duly signed by the Governor of the State and the Register of the State Land Office, and of record in the State Land Office, or any transfer of property by any sub-division of the State, shall be brought only within six years of the issuance of patent, provided, that suits to annul patents previously issued shall be brought within six years from the passage of this Act." *585 For the many reasons set forth below, we conclude that this provision was not intended to ratify the absolutely null conveyances of navigable water bottoms to private individuals and should not be applied as it was in Price; rather, we conclude that the legislature intended to do no more by its enactment than cure formal defects in patents that were essentially valid, in that they conveyed alienable property. California Co. v. Price, 225 La. 706, 74 So.2d 1, 17 (1954) (Hawthorne, J., dissenting); Carter v. Moore, 258 La. 921, 933, 248 So.2d 813, 817 (1971) (Barham, J., concurring).
In 21 Tul.L.Rev. 454 at p. 473 it is said:
"* * * It is doubtful that Act 62 of 1912 was intended to deprive the State of ownership of important commercial waterways or navigable bodies of water. The proper function of a limitation statute is to bar adverse claimants from enforcing rights against property upon the basis of defects in the title which, save for the statute of limitations, might render the title absolutely void. The statute of limitations is not intended to create a right of possession [ownership] when there is a total absence of authority for the inception of title; thus, the statute would not confirm title under a patent issued by an administrative official acting without legislative sanction or authority * * *."
This Court, in its opinion on rehearing in All-State Credit Plan Natchitoches, Inc. v. Ratliff, 279 So.2d 660 (La.1973), recognized that the capacity of prescription to divest ownership of property is strictly limited. In that case we stated:
"* * * Under our Civil Code, ownership can never be lost by the failure to exercise itonly by the acquisition of ownership by another through possession sufficient to acquire it through an acquisitive prescription. La.Civ. Code Art. 496. * * *" 279 So.2d at 666.
Act No. 62 of 1912, by its very nature a remedial or curative statute providing for liberative prescription, could not have vested ownership in private parties by the mere inaction of the true owner, the State. The State could deliver no title to this land. The patentee had acquired nothing which could be liberated from the State under a statute of liberative prescription or peremption.
Every rule of statutory construction bearing on the situation with which we are presented demands the result we reach. We do not mean to imply that rules of construction are ends in themselves or that they are always to be followed. But, Act 62, standing alone, is subject to varying interpretations and the applicable rules of construction are particularly helpful here to determine legislative intent.
Because Act No. 62 of 1912 is a statute of prescription or peremption, it must be presumed to have been adopted by a legislature aware that the provision would be strictly construed. "* * * [P]rescription is stricti juris and the statutes on the subject cannot be extended from one action to another, nor to analogous cases beyond the strict letter of the law." State v. Stewart Bros. Cotton Co. 193 La. 16, 19, 190 So. 317, 320 (1939). See also Hayes v. Levy, 81 So.2d 172 (La.App.2d Cir. 1955); Coastal States Gas Producing Company v. State Mineral Board, 199 So.2d 554 (La.App.3rd Cir. 1967). As this writer noted in his concurring opinion in Carter v. Moore:
"* * * More than this, because of the constitutional protection afforded the State from being adversely affected by prescription except upon express constitutional or statutory authority, prescription could never be pleaded against the State under implied authority." 248 So.2d at 823.
Thus, the very nature of Act No. 62 of 1912 mandates a narrow reading of its *586 provisions, which provisions in no way imply that absolutely null transfers of inalienable public land should be acquired by private landowners by the mere failure of the State to bring suit within the relatively short peremptive period afforded by the statute. A much more reasonable interpretation of the legislative intent is to attribute to the statute the power to cure only patents that were inherently sound and lacking only in some formal requisite for their validity.
A more basic reason for our refusal to construe Act No. 62 as a ratification of conveyances of navigable water bottoms is that statutes should be interpreted in light of the State's public policy. When an enactment is ambigous and susceptible of more than one interpretation, one of which is clearly inimical to a long established line of legislation and jurisprudence, common sense as well as legal doctrine mandate that the interpretation least offensive to the public policy be adopted.
Ambiguous statutory provisions should be interpreted in pari materiae with strong public policy. It is the general public policy which illumines the motive and purpose of the legislature in its action. Our Court used this method of statutory interpretation in Miami Corp. v. State, 186 La. 784, 173 So. 315 (1937).
Some of the scholarly criticism directed at the Price decision was aimed at the failure of the majority in that case to employ this basic rule of statutory interpretation:
"* * * It is a mild understatement to say that the Humble and California cases focused on an issue of statutory interpretation about which there was great doubt and serious uncertainty. Of the six different opinions written in the California case, three are dissents. In the light of these facts, it cannot be denied that either one solution or the other could be sustained by reasonably adequate legal argumentespecially since the so-called intent of the 1912 legislature is necessarily an imputed intent formulated by people here and now about what may or may not have been in the minds of other people more than forty years ago. Under such circumstances the decision of the case should have been in conformity with the public policy of the state, that is, to sustain the inalienability by the state of the beds of navigable waters because they are insusceptible of private ownership." Dainow, Property, 15 La.L.Rev. 273.
"* * * The question presented in these cases [California and Duck Lake] was whether the 1912 act should be interpreted to exclude from its terms any patents which might embrace the beds or bottoms of navigable bays and lakes. Despite the previous landmark decision of Miami Corporation v. State and the policy reflected in the Civil Code sustaining the legal doctrine that beds of navigable waters are insusceptible of private ownership, these cases rejected the view that the 1912 act excluded patents that embraced the beds of navigable waters.

"Because these decisions run counter to the policy expressed in the Civil Code and in the Constitution of 1921, and because it may be cogently argued that the interpretation given to Act 62 of 1912 does violence to the legislative intent, it is easily understandable that the fareaching effect of these decisions would evoke legislative action during the 1954 sessions. * * *" Hebert and Lazarus, Legislation Affecting the Civil Code, 15 La.L.Rev. 9, 22 (emphasis supplied).
"The ill-starred Price decision rests, indeed, on a `weak jurisprudential foundation,' is contrary to the whole spirit of Louisana legislation, and does violence to fundamental precepts of Louisiana property law by allowing public things to be privately owned." Yiannopoulos, Validity of Patents Conveying Navigable WaterbottomsAct 62 of 1912, Price, Carter, and All That. 32 La.L.Rev. 1, 18 (1971).
*587 The concurring opinion in Carter v. Moore is apposite:
"While citing numerous statutes which expressed the public policy of inalienability of the bottoms of navigable waters (omitting only the two earliest ones, Act No. 247 of 1855 and Act No. 124 of 1862), the majority of Price glided over this consistency of legislative intent. A contrary intent and policy were inferred from the broad, general language in a single statute which permits prescription or peremption to bar certain state claims. It is an extremely strained and stretched interpretation of this statute to hold it ran counter to all prior legal authority which had prohibited the alienation of the beds of navigable waters, and to hold that such a broad, general statement by the Legislature had the effect of validating patents which, being in contravention of law and public policy, were absolute nullities when they were issued." 248 So.2d 813, 824.
Moreover, it is well settled that repeals by implication are not favored and will not be indulged if there is any other reasonable construction. State v. Standard Oil Co. of Louisiana, 188 La. 978, 178 So. 601 (1937); Wenk v. Anisman, 211 La. 641, 30 So.2d 567 (1947); State v. Randall, 219 La. 578, 53 So.2d 689 (1951). "If the Legislature by the enactment of Act No. 62 of 1912 had intended to repudiate the articles of the Code and make such a serious change in the existing public policy of the State, it would have expressed that intention. * * *" California Co. v. Price, 225 La. 706, 74 So.2d 1, 22 (Hawthorne, J., dissenting). To allow an entrenched maxim of legal principle to be uprooted by so oblique a legislative pronouncement would pervert the judicial duty to seek and enforce the legislative will.
Our conviction that the legislature did not intend to deviate from its established policy is further intensified by the fact that just two years before Act No. 62 was passed, and again two years after that act, and in 1924 and 1932, the legislature reasserted its unswerving adherence to the proposition that navigable water bottoms are the property of the State and cannot be alienated. Stronger evidence of the error in the construction of the act advocated here by the private litigants can hardly be imagined.
Buttressing out method of interpreting this statute is the United States Supreme Court's construction of the federal statute after which ours was patterned.
As pointed out by Professor Yiannopoulos:
"* * * Act 62 of 1912 was patterned after an 1891 federal statute of repose which reads as follows: `Suits by the United States to vacate and annul any patent shall be brought within six years after the date of the issuance of such patents." 43 U.S.C. § 1166. A six year prescriptive period is most unusual in Louisiana and cannot be traced to any other source. Cases applying the federal statute declare that the statute cannot be used to validate a patent of lands not subject to disposition under other federal laws. Thus, federal cases interpreting the source provision are directly contrary to the Price decision." Yiannopoulos, § 32.5, n. 140.8 at 19 (1975 Supp.).
Supporting Professor Yiannopoulos' observation is a considerable line of cases providing that "* * * [t]he [federal] act was one of a series of acts, and manifestly applies only to the public lands of the United States subject to acquisition under the laws enacted for the disposition of the public domain." (Emphasis supplied.) Northern Pacific Railway Company v. United States, 227 U.S. 355, 367, 33 S.Ct. 368, 373, 57 L.Ed. 544, 550 (1913). See also United States v. Winona & St. Peter Railroad Company, 165 U.S. 463, 17 S.Ct. 368, 41 L.Ed. 789 (1897).
In La Roque v. United States, 239 U.S. 62, 36 S.Ct. 22, 60 L.Ed. 147 (1915), it was stated that 43 U.S.C. 1166 "* * * is part *588 of the public land laws and refers to patents issued for public lands of the United States. This trust patent was not issued for public lands of the United States, but for reserved Indian lands to which the public land laws had no application. * * *" See also United States v. Minnesota, 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539 (1926). (Emphasis supplied.)
In United States v. Chandler-Dunbar, 209 U.S. 447, 28 S.Ct. 579, 52 L.Ed. 881 (1908), Mr. Justice Holmes begins his disposition of the issue of the applicability of the 1891 statute limiting suits by the United States to vacate and annul patents by stating, "* * * [t]his land, whether reserved or not, was public land of the United States, and in kind open to sale and conveyance through the Land Department." (Emphasis supplied.)[5] He cites United States v. Winona, supra, which stated, regarding the act of 1891, that:
"* * * [U]nder the benign influence of this statute it would matter not what the mistake or error of the land department was, what the frauds and misrepresentations of the patentee were, the patent would become conclusive as a transfer of the title, providing only that the land was public land of the United States and open to sale and conveyance through the land department." (Emphasis supplied.) United States v. Winona, 165 U.S. at 476, 17 S.Ct. at 371, 41 L.Ed. at 795.
What all of these cases say is that if the United States had the power to make or validate the sale of the land the patent issued could not be attacked after a period of limitation even for fraud or ill practices. The question as to whether patents could be attacked was simply whether the patents were issued on lands covered by the public land acts of Congress. Thus, lands which were inalienable because they were not "public lands" within the contemplation of the congressional acts could not be acquired by a mere statute of limitations for there was no title to transfer in the beginning. For example, the lands held by the government for the Indians were incapable of alienation by the government, for they were held in trust for the Indians. See La Roque v. United States, supra, and United States v. Minnesota, supra.
Aligning this construction of the source act of our own statute of repose with our statute, it is readily apparent that the navigable water bottoms we consider were lands held by the State for the people and were not subject to alienation. There was no original authority in the State to transfer title and therefore there could be no ratification of any attempt to create title in another.
Another factor influencing our conception of the intended purpose of Act No. 62 is one which perhaps could, in itself, be dispositive of the issue before us had we chosen to rely solely upon it. The right of ownership of navigable water bottoms was vested in the State of Louisiana upon its admission into the Union in 1812 on an equal footing with the original thirteen states. See Shively v. Bowlby, 152 U.S. *589 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823); Illinois Central Ry. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892); Weber v. Board of State Harbor Commissioners, 85 U.S. (18 Wall.) 57, 21 L.Ed. 798 (1873); Pollard's Lessee v. Hagan, 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). The United States Supreme Court held in Martin v. Waddell, 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842) that after the Revolution, the people of each state themselves became sovereign, and in that character hold title to all navigable waters and their beds for their own common use, subject only to the supremacy of the federal government. This proposition has been restated in the recent case of Bonelli Cattle Company v. Arizona, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973). Because of the equal footing doctrine, states subsequently admitted to the Union likewise acquired the beds of navigable waters, but only in the capacity of trustee for the interest of the people of the state.
It was held in Illinois Central Ry. Co. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 118, 36 L.Ed. 1018 (1892), that the states cannot abdicate their trust over property in which the people as a whole are interested so as to leave it entirely under the use and control of private parties. In that case, the United States Supreme Court even held that a legislative grant of the State's title to submerged lands under Lake Michigan could be repealed by subsequent legislation because the lands in question were held in trust for the public use. See dissenting opinion of Hawthorne, J., from denial of writs in State v. Cenac, 132 So.2d at 933.
In Federal and State Lands in Louisiana, Madden says the following about the application of the public trust concept in Louisiana:
"It appears only realistically factual and legally sound to adopt and state the view that the public policy of the state treating navigable water beds as inalienable and insusceptible of private ownership actually arose when Louisiana attained statehood, for the public trust was then created, resulting in the vesture of a fixed and indestructible public right, only changeable by the consent and positive action of the people of the state in their collective sovereignty. Under that premise, doubt has been expressed as to the legal effectiveness of legislation to surrender the vested rights of the people themselves, the more plausible and stronger view being that the abdication of such vested public rights could only be lawfully accomplished by constitutional means and procedure." (Emphasis supplied.) Madden at 335.
This theory casts grave doubt upon whether the legislature could have alienated the beds of navigable waters under the 1912 repose statute or, for that matter, under any legislative pronouncement; for this reason, we stated above that the notion of public trust could be dispositive of this case.
It is now clearly manifested by the La. Constitution of 1921, Art. IV, § 2, and the La. Constitution of 1974, Art. IX, § 3, that the State can never divest itself of its navigable water bottoms except through authority of the people themselves. We hold, for pre-constitutional purposes that because the beds of navigable waters of Louisiana are held in "public domain" for the people of the State, that at the very least (if at all possible) "* * * [a]ny alienation or grant of the title to navigable waters by the legislature must be express and specific and is never implied or presumed from general language in a grant or statute. * * *" California Co. v. Price, 74 So.2d at 21 (Hawthorne, J., dissenting). Thus, we find another compelling reason for confining the effect of Act 62 to ratification of transfers by patent only insofar as the transfer is of property susceptible of alienation.
Finally, we pass to the last major factor influencing our interpretation of the 1912 *590 repose statute. In 1954, responding to the majority's invitation in the Price decision handed down earlier the same year, the Louisiana legislature enacted Act 727 of 1954, now incorporated in the Louisiana Revised Statutes as La.R.S. 9:1107-1109. That law provides:
"§ 1107. Public policy respecting ownership of navigable waters and beds thereof
"It has been the public policy of the State of Louisiana at all times since its admission into the Union that all navigable waters and the beds of same within its boundaries are common or public things and insusceptible of private ownership; that no act of the Legislature of Louisiana has been enacted in contravention of said policy, and that the intent of the Legislature of this state at the time of the enactment of Act No. 62 of the year 1912, now appearing as R.S. 9:5661, and continously thereafter was and is at this present time to ratify and confirm only those patents which conveyed or purported to convey public lands susceptible of private ownership of the nature and character, the alienation or transfer of which was authorized by law but not patents or transfers which purported to convey or transfer navigable waters and the beds of same.
"§ 1108. Invalidity of patent or transfer purporting to include navigable waters and beds thereof
"Any patent or transfer heretofore or hereafter issued or made is null and void, so far as same purports to include such navigable waters and the beds thereof, as having been issued or made in contravention of the public policy of this state and without any prior authorization by law; provided that the provisions of this Section shall not affect the laws of accretion or apply to lands that were susceptible to private ownership on the date of the patent or transfer by the state or a state agency.
"§ 1109. Statutes not to be construed as validating purported transfer of navigable waters or beds thereof
"No statute enacted by the legislature of Louisiana shall be construed as to validate by reason of prescription or peremption any patent or transfer issued by the state of any levee district thereof, so far as the same purports to include navigable or tide waters or the beds of same."
Although the issue has never been passed upon by this Court, it has been suggested by some that Act No. 727 of 1954 is unconstitutional because it is a legislative usurpation of judicial power to interpret legislation and amounts to retroactive legislation impairing property rights. See concurring opinion of Mr. Justice Summers in the denial of writs in State v. Cenac, 241 La. 1055, 132 So.2d 928 (1961); see also, Comment, Ownership of Beds of Navigable Waters, 30 Tul.L.Rev. 115, 125 (1955). Because Act No. 727 is not necessary to our decision in this case, we need not decide that issue squarely. We point out, however, that genuine interpretive legislation is a recognized function of legislatures in systems of codified laws, being considered a correlative of the power to legislate. The legislature, after all, seems to be an appropriate agency to clarify the meaning of its own statements. 1 M. Planiol, Treatise on the Civil Law, §§ 208-11 at 155-56 (La.St.L.Inst. transl. 1959); Yiannopoulos § 32.5. Moreover, the United States Supreme Court recognized the authority of Congress to enact interpretive legislation in Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Thus, interpretive legislation is not inherently violative of the principle of separation of powers.
We find these observations especially applicable to Act 727. The repose statute of 1912 was ambiguous; in the Price case, the majority of this Court expressly told the legislature that if it had found the *591 Court's interpretation of the 1912 statute incorrect in the cases preceding Price, it could have corrected that interpretation. The lawmakers reacted by adopting the only legislation which could respond effectively to the judicial suggestion. If ever the Legislature were entitled to have an interpretive act upheld as not being an invasion of the judicial function or an abrogation of the theory of separation of powers, certainly the legislature which passed Act 727 as a response to the Court's solicitation was so entitled.
Moreover, interpretive legislation cannot properly be said to divest vested rights, because, under civilian theory, such legislation does not violate the principle of non-retroactivity of laws. The interpretive legislation does not create new rules, but merely establishes the meaning that the interpreted statute had from the time of its enactment. It is the original statute, not the interpretive one, that establishes rights and duties. 1 M. Planiol, Treatise on the Civil Law, § 251 at 179 (La.St.L.Inst. transl. 1959); Yiannopoulos § 32.5 at 18 (1975 Supp.).
Without holding that the 1954 act is a truly interpretive statute,[6] we do no more than cite its provisions as additional evidence, entitled to great weight in light of the context within which it was passed, that the legislative intent in passing the 1912 statute was not to divest itself of inalienable navigable water bottoms. We would reach the same result whether the Act had been passed or not, but we feel that the legislature's own response to the clearly erroneous Price decision fortifies our holding.
Moreover, the passage of Act 727 of 1954 within eleven days after the finality of the Price decision performed another function. The people of this state have been on notice since that time that the rule of property in this state is not the one announced in Price or in the Humble case; rather, it is that rule pronounced, and never varied from, by the legislature forbidding private acquisitions of navigable water bottoms. Article 1 of the La.Civil Code states: "Law is a solemn expression of legislative will." Enactments of the legislature are presumed to be constitutional and valid until declared otherwise by a court of competent jurisdiction. Thus, protest should not be heard from those who say the overruling of Price will work a hardship upon those who relied on its pronouncements.
The so-called rule of property has little or no validity in this civilian jurisdiction. That concept stems from the theory of stare decisis, is founded entirely upon common law, and finds no basis in our Civil Code, or in our statutory law. Stability in the law and constancy of jurisprudence are undoubtedly objects to be constantly sought. However, when it is necessary to overrule a short line of clearly erroneous jurisprudence in order to reinstate the long-standing law and public policy of this State, that course is clearly the one that must be followed.
In Miami Corporation v. State, 173 So. at 320, it was stated:
"* * * In Louisiana, this court has never hesitated to overrule a line of decisions where they establish a rule of property when greater harm would result from perpetuating the error rather than from correcting."
The following is also applicable:
"The civilian does not regard the judicial interpretation of a statute as becoming part of the statute, so that the statute as interpreted is the law. He *592 regards the statute alone as being the law, and prior decisions do not insulate him . . . from going directly to the statute for its meaning. In ideal theory, the civilian judge decides cases primarily not by reference to other decisions, but by reference to legislative texts and within the limits of such judicial discretion as the legislative texts grant." Tate, Techniques of Judicial Interpretation in Louisiana, 22 La.L.Rev. 727, at 744 (1962).
In conclusion, we hold that patents conveying state property to private individuals are ineffective insofar as they purport to alienate the beds of navigable waters, and that Act No. 62 of 1912 did not have the effect of ratifying such absolutely null transfers. Thus, the State is the owner of the entire property involved in this case. We expressly overrule the holdings in California v. Price, State v. Cenac, and all other cases where a contrary view is expressed.
Louisiana Civil Code arts. 501, 502, 503 and 3453 are concerned with the ownership of the fruits when there is a true owner and another who claims to be the owner. A distinction is made favoring the good faith possessor who is described as one "* * * who possesses as owner by virtue of an act sufficient in terms to transfer property, the defects of which he was ignorant of. * * *" La.C.C. art. 503. A bona fide possessor ceases to occupy that position when the defects in his title are made known to him or when a suit is instituted to claim restitution. La.C.C. arts. 503 and 3453. There is some controversy as to whether mineral royalties are to be treated as fruits entitling a good faith possessor to retain them against the true owner. See Martel v. Hunt, 195 La. 701, 197 So. 402 (1940); Comment, The Measure of Damages for Unauthorized Production of Oil and Gas: The Role of Good and Bad Faith, 15 Tul.L.Rev. 291 (1941); Mason v. United States, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396 (1923); Yiannopoulos, § 137, particularly notes 233 and 239, at 412 et seq.
Under the particular facts and extreme circumstances in the case we review, we are not too concerned with making an express classification of mineral royalties, especially in view of the recent enactment of the new Mineral Code and the absence of brief or argument on that point of law in this case. Because of the extreme state of flux in the law relating to ownership of navigable water bottoms, plaintiff in this concursus proceeding was required to acquire leases from both the defendants in order to be certain of protecting its interests. Defendants were and are caught on the horns of a dilemma which is finally resolved by this Court. Without resolving the question of whether such revenues as mineral royalties are technically "fruits" or not, we feel constrained, without making an exception to a rule or stating any general rule of law, to accord the rights of a bona fide possessor to the private litigants in this matter. As suggested by Mr. Justice Tate in his concurrence on rehearing in Carter v. Moore, 248 So.2d at 829, "* * * [w]e would thus be according such possessors the benefits equivalent to those usually accorded possessors in good faith. * * *" we believe that such a solution is "just, legal and proper" in the case under the vagaries of the law and particular circumstances and facts of the case. La.C.C.P. art. 2164.
This concursus proceeding was instituted on February 21, 1964 and we will treat the commencement of that proceeding as the notice which terminates bona fide and good faith possession under La.Civil Code arts. 503 and 3453. Royalties accumulated and deposited on the day of this concursus proceeding will be distributed to the private litigants and royalties accruing thereafter will be accounted for and paid to the State.
This concursus proceeding purports to put before the Court solely the issue of title to the proceeds from the royalty earnings *593 deposited by the plaintiff in the registry of the Court. Since we find the right to the proceeds originally deposited belong to the "private" defendants, and the right to the proceeds thereafter belongs to the other defendant, the State, we necessarily pass upon the issue of ownership of the property from which the royalty is derived under the mineral leases. We find it necessary and proper to cast the judgment on both the issue of the right to the funds on deposit and the right to claim the ownership of the immovable which produced the royalty. The concursus proceeding has impleaded those who claim conflicting interests to assert those interests contradictorily in this proceeding. La.C.C.P. arts. 4651, 4654. After the full litigation between the two adverse claimants as to the ownership of that immovable, the record permits us to pass with finality upon the issue of title and we have determined that the State ownshas dominion overthis immovable property against all private persons.
For the reasons assigned, it is therefore ordered, adjudged and decreed:
(1) That the State of Louisiana is declared to be the owner and entitled to possession of the Southwest Quarter (SW ¼) of Section 26, Township 19 South, Range 18 East in Plaquemines Parish;
(2) That the plaintiff, Gulf Oil Corporation, shall pay unto the State of Louisiana all royalties attributable to the one-eighth lessor's royalty interest in production of oil and gas from all future and existing wells drilled and completed as producers on that property from February 21, 1964;
(3) That there be judgment in favor of the defendants, Milner Realty Co., Inc., Louis Carmadelle, Jr. and Gustave Carmadelle, and they are declared owners of the funds originally deposited in the court, less and except the costs of these proceedings:
(4) That if the funds deposited are not sufficient to cover the costs of these proceedings any other costs shall be taxed one-half against the defendants, Milner Realty Co., Inc., Louis Carmadelle, Jr. and Gustave Carmadelle, and one-half against the State Mineral Board and the Register of the State Land Office to the extent that such costs are provided by law.
Accordingly, the judgments of the court of appeal and trial court are affirmed as modified.
* * *
SUMMERS, J., dissents for the reasons assigned.
MARCUS, J., dissents for reasons assigned by SUMMERS, J.
DIXON, J., dissents.
SUMMERS, Justice (dissenting).
Gulf Oil Corporation provoked this concursus proceeding to determine the true owner of the Southwest Quarter of Section 26, Township 19 South, Range 18 East, in Plaquemines Parish. As lessee, Gulf had accumulated funds from the production of oil and gas attributable to these properties. These funds were deposited in the registry of the Court for distribution to the parties determined to be the owners.
Claims of ownership are asserted by Milner Realty Co., Inc., Louis Carmadelle, Jr., and Gustave Carmadelle, referred to collectively as Carmadelles, on one hand, and the State Mineral Board and the Register of the State Land Office, referred to as the State, on the other.
Judgment in favor of the State in the trial court was appealed by the Carmadelles and affirmed by the Fourth Circuit. 291 So.2d 807. Certiorari was granted on May 31, 1974 to review this judgment. 294 So.2d 831. Our original judgment affirmed.
Rehearing was granted to reconsider the basis for the Court's original decision, and, if necessary, to consider the other issues presented.
In the Court's original opinion the decision was based upon Section 5661 of Title 9 of the Revised Statutes, which provides:

*594 "Actions, including those by the State of Louisiana, to annul any patent issued by the state, duly signed by the governor and the register of the state land office, and of record in the state land office, are prescribed by six years, reckoning from the day of the issuance of the patent."
However, this section of the Revised Statutes has no application here. The Carmadelles base their suit upon Act 62 of 1912 which reads as follows:
"Section 1. Be it enacted by the General Assembly of the State of Louisiana, etc., That all suits or proceedings of the State of Louisiana, private corporations, partnerships or persons to vacate and annul any patent issued by the State of Louisiana, duly signed by the Governor of the State and the Register of the State Land Office, and of record in the State Land Office, or any transfer of property by any sub-division of the State, shall be brought only within six years of the issuance of patent, provided, that suits to annul patents previously issued shall be brought within six years from the passage of this Act.
"Section 2. Be it further enacted, etc., That all laws or parts of laws in conflict herewith be and the same are hereby repealed."
Although Section 5661 has its source in Act 62 of 1912, the Louisiana State Law Institute, and the Reporters involved in the preparation of the draft of the Revised Statutes, made certain deletions and changes to Act 62 of 1912 which are important to this case. Pertinently, the clauses "or any transfer of property by any sub-division of the State" together with the clause "provided, that suits to annul patents previously issued shall be brought within six years from the passage of this Act" were deleted from Act 62 of 1912. Obviously the changes are substantial and substantive.
Act 62 of 1912 covers "any patent issued by the State of Louisiana" and imposes signing and recording requirements relating to this type conveyance. Another, and second, type of conveyance contemplated by the Act is "any transfer of property by any sub-division of the State." The latter clause requires neither signing by the Register of the Land Office nor recordation in the State Land Office.
Section 5661 became effective in 1951 when the Revised Statutes were enacted. This was long after the rights of the Carmadelles had accrued by virtue of Act 62 of 1912 under their dual acquisitions from the Grand Prairie Levee District on October 29, 1910 and from the State of Louisiana by Patent No. 104 on March 11, 1911. Because Section 5661, enacted in 1951, can have no retroactive application to rights which became vested in 1918, "six years from passage" of the Act of 1912, this case must be decided on the basis of the Act of 1912 and not Section 5661 enacted almost forty years later. La.R.S. 1:2 and 1:16.
When Louisiana was admitted into the Union on April 8, 1812 "on an equal footing with the original states", Louisiana like all other states, acquired title, by virtue of its inherent sovereignty, to the beds of navigable water bodies situated within its boundaries. Act of Congress of April 8, 1812, 2 U.S.Stat. 701; Martin v. Waddell, 16 Pet. 367 (41 U.S. 367, 1842), 10 L.Ed. 997; State v. Capdeville, 146 La. 94, 83 So. 421 (1919). By the terms of the Act of Congress of February 20, 1811, 2 U.S.Stat. 641, setting out the conditions of admission, the waste and unappropriated lands lying within the State were ceded to the federal government for its "sole and entire disposition." Thereafter, by enactment of the Swamp Land grants of 1849 and 1850 the federal government conveyed to the state all swamp and overflowed land, unfit for cultivation, lying within its boundaries, subject to prior grants. 9 U.S. Stat. 352 and 9 U.S.Stat. 519.
The Enabling Act and the Act of Admission imposed upon the State, as a condition of its admission, the obligation to maintain as "common highways, and for *595 ever free" the Mississippi River "and the navigable rivers and waters leading into the same, and into the gulf of Mexico." Other than this provision and the obligations imposed upon all states by the interstate commerce clause of the United States Constitution, the State of Louisiana, through its proper authority, the Legislature and the State Constitution, was free to dispose of its navigable water bottoms as it deemed proper.
This background review of the legal structure underlying state water bottoms is basic to any consideration of the State's authority to convey these properties. Once a state acquired title to navigable water bottoms from the federal government, it became vested with title to the property and was free to transfer or convey title under state law. See Bonelli Cattle Co., v. Arizona, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973); Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); State v. Richardson, 140 La. 329, 72 So. 984 (1916). In nine states the riparian owners have been ceded the beds of navigable waters by the states.
In order to promote the construction of levees so as to prevent disastrous floods all lands belonging to the State of Louisiana situated within the boundaries of the Grand Prairie Levee District were conveyed to the District by Act 24 of 1898. To provide the means to carry out the purposes of the Act, the District was authorized and empowered to sell or otherwise dispose of these lands as the Board of Commissioners of the District "shall deem proper." The Act of 1898 was amended by Act 43 of 1900 extending the lower limits of the District.
Thereafter "in order to provide additional means to carry out the purposes of said Act 24 of 1898 . . . and to furnish resources to enable said board to assist in developing, establishing and completing a levee system" the lands of the extended area were conveyed to the District with "the power and authority to sell . . . or otherwise dispose of said lands" in such manner as the District's Board of Commissioners "shall deem proper." A procedure was established by Act 215 of 1908 for the purchase of lands belonging to the State or levee boards. The Act provided for the deposit of a good faith application fee, surveys, publication of the terms of the sale and for the sale by the sheriff of the parish. Upon sale by the sheriff a provisional deed was to be issued to the last and highest bidder. Upon surrender of said deed the holder was entitled to a patent signed by the president of the levee board and the Governor of the State.
The Carmadelles exhibit a chain of title with dual origins beginning with a sale in accordance with Act 215 of 1908. After deposit of the fee and due advertisement, and compliance with other formalities required by Act 215 of 1908, the sale was made at public auction by the sheriff of Plaquemines Parish to Millard C. Baker on October 29, 1910. This adjudication conveyed title to the Southwest Quarter of Section 26, Township 19 South, Range 18 East, Parish of Plaquemines. The deed recites that the sheriff did thereby
"sell and transfer said property to Millard C. Baker and all rights and title, which the said Board of Commissioners for the Grand Prairie Levee District had in or to the said before described property, to have and to hold the same to the said, Millard C. Baker, his heirs and assigns forever, subject to obtaining from the Board of Commissioners for The Grand Prairie Levee District and the Governor of this State, a patent for said lands upon surrender of this provisional deed as provided by Act 215 of 1908."
Following the adjudication and delivery of the deed, on March 4, 1910 the State of Louisiana issued Patent No. 104 in confirmation of the transfer. Baker recorded the patent in the conveyance records of *596 Plaquemines Parish on May 8, 1911. The property thus conveyed consisted of a navigable water bottom.
Baker then transferred the property to Plaquemines Land Company on May 11, 1911. Plaquemines Land Company failed to pay the 1916 taxes and the land was adjudicated to the State at tax sale in 1917. On October 27, 1937 Plaquemines Land Company sold to J. W. Milner. The property was redeemed from the State of Louisiana on August 2, 1938 in the name of Plaquemines Land Company, never having been sold or otherwise alienated by the State.
The heirs of J. W. Milner then transferred to Milner Realty Co., Inc., and the land was again adjudicated to the State in 1942 for the nonpayment of 1941 taxes. M. C. Baker and Plaquemines Land Company also transferred to Mary Louise Baker. Another redemption from the State followed on March 1, 1951. Thereafter Mary Louise Baker transferred to Louis J. Carmadelle, Jr., and Gustave Carmadelle on August 26, 1960. All taxes due to the State have been paid since 1911. Leases were executed to Gulf on October 31, 1962 and production was obtained. Finally, on March 1, 1963 the Carmadelles and Milner Realty Co., Inc., effected an exchange which resolved their apparently conflicting claims.
The Carmadelles contend that they obtained a valid patent from the State of Louisiana in 1911. In addition, it is asserted they obtained a transfer of property by a subdivision of the State (Grand Prairie levee District). Thus, they reason, even if these deeds transferred navigable water bottoms to Baker, their ancestor in title, in violation of statutes and codal articles prohibiting such sales and declaring navigable water insusceptible of private ownership, prescription would bar any suits or proceedings to annul their deeds for suit must have been instituted within six years from the passage of Act 62 of 1912. Suits or proceedings were not instituted to annul these deeds within six years of the passage of Act 62 of 1912, they assert, and prescription has tolled and title to the water bottoms thus conveyed became incontestable, confirmed and ratified.
Reliance is placed by the Carmadelles upon this Court's long line of decisions culminating in Humble Oil & Refining Company v. State Mineral Board, 223 La. 47, 64 So.2d 839 (1953) and California Co., v. Price, 225 La. 706, 74 So.2d 1 (1954). These two cases together with State v. Sweet Lake Land and Oil Co., 164 La. 240, 113 So. 833 (1927); Realty Operators, Inc. v. State Mineral Board, 202 La. 398, 12 So.2d 198 (1942) and O'Brien v. State Mineral Board, 209 La. 266, 24 So.2d 470 (1945) stand for the basic proposition that Act 62 of 1912 is an absolute statute of repose even as to patents or other transfers which purport to convey navigable water bottoms, and that such patents and transfers become unassailable if a suit to annul is not instituted within six years from the date of the passage of the Act.
The State takes the position that navigable water bottoms are insusceptible of private ownership and, even if patents or transfers are literally within the purview of the statute of repose, the Act should not be construed to protect from attack patents or transfers purporting to convey navigable water bottoms. This theory is principally predicated upon the supposition that the legislature did not intend that Act 62 of 1912 should apply to patents or transfers of navigable water bottoms.
To adopt the State's view would be an unduly limited and restrictive interpretation of Act 62 of 1912 not supported by canons of statutory interpretation, State statutes of the time or public policy which led to the enactment of the Act of 1912. Adopting the State's contention would also involve overruling and rendering nugatory an unbroken line of jurisprudence dating back fifty years. These cases announce a rule of property which has achieved the dignity of jurisprudence constante. To adopt the *597 State's unsettling position would make necessary an unending series of piecemeal litigations involving ancient titles to water bottoms and other properties in this State. The State's position suggests that this Court should do irreparable harm to the public policy demanding stability and predictability of titles to immovable property.
A paramount canon of statutory interpretation ordains that "When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit." La.Civil Code art. 13.
Another important principle of construction having special relevance to this case requires that laws are to be construed in light of conditions at the time of passage and not by circumstances not known or envisioned at the time of their enactment. Tennessee Gas Transmission Co. v. Violet Trapping Co., 248 La. 49, 176 So.2d 425 (1965), cert. denied, 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 155.
One argument advanced against the efficacy of the rationale upon which the Price Case is grounded is that it was not the legislative intent that Act 62 of 1912 should be construed to apply to patents and transfers purporting to convey navigable water bottoms to private ownership; because when the Act of 1912 was adopted, Articles of the Civil Code and Acts of the legislature which have been known as the "Oyster Statutes" declared navigable water bottoms insusceptible of private ownership.
This, of course, is a question of statutory construction. In 1912 Louisiana's Legislature, as the repository of sovereign authority, was the ultimate authority on whether navigable water bottoms could be conveyed to private owners. Only the will of the people expressed in a constitutional mandate could limit or restrict this legislative authority. And, it is clear, no such constitutional restraint or limitation existed at that time. It was not until the adoption of Section 2 of Article IV of the Constitution of 1921 that an express constitutional prohibition against the alienation of water bottoms came into being. Even then the sale of navigable water bottoms for reclamation purposes was permitted, subject to a reservation of minerals.
Under these elementary principles, it was wholly within the authority of the legislature to confirm and ratify the sale of navigable water bottoms notwithstanding that it had previously enacted legislation prohibiting these alienations. La.Civil Code arts. 22 and 23. Articles of the Civil Code, and the oyster statutes upon which such weighty reliance is placed under the State's theory, were subject to being overturned, modified and amended by the later enactment by the legislature of the statute of repose. This was an important part of the theory of the Price Case. Recognition of and adherence to these fundamental propositions is absolutely necessary to the orderly application of laws enacted by the Legislature.
Adding to the unrest which has lately been in evidence relative to the Price Case are cases decided by the Fourth Circuit upon which the State relies. See Winkler v. State, La.App., 239 So.2d 484 (1970) and Stevens v. State Mineral Board, La.App., 221 So.2d 645 (1969). In these decisions the Court of Appeal held that transfers made subsequent to the enactment of Acts 189 and 258 of 1910 were not protected by the statute. These Acts are part of the series of oyster statutes. Act 189 declared that water bottoms bordering on or connected with the Gulf of Mexico and that part of the Gulf within Louisiana and the oyster beds therein were the property of the State "except as otherwise provided." By the terms of Act 189 no sale or conveyance of water bottoms "shall hereafter be made by the Register of the State Land Office by any other official or by any subordinate political corporation." After this brief declaration the statute then proceeds, at length, to establish regulations for the oyster industry.
Act 258 of 1910 is a legislative declaration that waters of and in all bayous, *598 lagoons, lakes and bays and the beds thereof "not at present under the direct ownership of any person" were the property of the State. While declaring the State's ownership and recognizing the authority of the Federal government over navigation, the Act declared in a proviso that the declaration was "not intended to interfere with the acquisition in good faith of any waters or the beds thereof transferred by the State or its agencies prior to the passage of the Act . . . ." The Courts of Appeal reasoned that the 1910 Acts had the effect of making subsequent transfer absolute nullities. Apparently the theory was that the 1910 Acts expressly prohibited the subsequent transfers of state-owned water bottoms into private ownership whereas the prior codal articles and statutes were only declaratory of state ownership.
The fallacy of this rationale is the failure to consider the underlying fundamental principles of statutory construction which makes the latest expression of the legislature prevail over earlier enactments. La.Civil Code Arts. 22 and 23. Act 62 of 1912 was obviously intended to establish conditions for quieting title to all patents or transfers executed by the State, or a subdivision of the State, irrespective of the character of the property conveyed. Just as the Acts of 1910 recognized and quieted the titles to previous conveyances of water bottoms by the State, and implicitly recognized that the State's right to convey water bottoms and ratify prior transfers, the Act of 1912 likewise superseded the 1910 declaration against alienation and confirmed and ratified all prior transfers unless suit was instituted to annul defective titles "within six years of passage" of the Act of 1912. No such suit or proceeding was timely instituted in the instant case.
Based primarily on Articles 450-453 and 482 of the Civil Code,[1] the State argues that the beds of navigable water bottoms in Louisiana have been declared inalienable and for that reason the 1912 Act of repose cannot be construed as quieting a transfer of water bottoms to private ownership. Aside from the fact that after careful and painstaking consideration this precise contention was rejected by the Court in the Price Case, these articles of the Code did not lock in forever the propositions they announced. These articles of the Code owe their existence to the authority of the legislature. The legislature which gave them life had the power to end, modify or otherwise alter the authority *599 of these articles. When the legislature enacted the statute of repose in 1912 it was accomplished with the full knowledge of its effect upon the articles of the Code and all previous legislative enactments. In its wisdom, which this Court is not at liberty to question, the legislature declared a strong public policy demanding stability of titles to immovable property when it enacted the 1912 statute of repose.
Any attempt to construe the scope and effect of the 1912 statute of repose should give due weight to the decisions which have considered the federal statute of repose, for this statute furnished the pattern for an almost identical Louisiana Act. See the Act of Congress of March 3, 1891, 26 U.S.Stat. 1099, viz.:
"Suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents."
From a comparison of this federal act with the Louisiana Act of 1912 it is apparent that the Louisiana Act is broader in scope and more embracing in its curative effects than the federal act. Seegers v. Parker, 256 La. 1039, 241 So.2d 213 (1970) and Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963) have held that the decisions of federal courts interpreting federal statutes were highly persuasive in interpreting state statutes patterned after those federal statutes.
The decision and opinion in United States v. Chandler-Dunbar Water Power Co., 209 U.S. 447, 28 S.Ct. 579, 52 L.Ed. 881 (1908), is of particular importance. There the United States instituted suit to remove a cloud from its title to two islands in a navigable river, claiming that defendant's patent was null because the land had been reserved for public purposes. Defendant relied upon the federal statute of repose quoted above. Justice Holmes wrote:
"There is force in the contention of the United States that the land was reserved and that it had not been surveyed, but we find it unnecessary to state or pass upon the arguments, because we are of opinion that now the patent must be assumed to be good. The statute just referred to provides that `suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act,'that is to say, from March 3, 1891. This land, whether reserved or not, was public land of the United States, and in kind open to sale and conveyance through the Land Department. (Citations Omitted) The patent had been issued in 1883 by the President in due form and in the regular way. Whether or not he had authority to make it, the United States had power to make it or to validate it when made, since the interest of the United States was the only one concerned. We can see no reason for doubting that the statute, which is the voice of the United States, had that effect. It is said that the instrument was void and hence was no patent. But the statute presupposes an instrument that might be declared void. When it refers to `any patent here-to-for issued,' it describes the purport and source of the document, not its legal effect. If the act were confined to valid patents it would be almost or quite without use. (Citations Omitted)
"In form the statute only bars suits to annul the patent. But statutes of limitation, with regard to land, at least, which cannot escape from the jurisdiction, generally are held to affect the right, even if in terms only directed against the remedy. (Citations Omitted)

"This statute must be taken to mean that the patent is to be held good, and is to have the same effect against the United States that it would have had if it had *600 been valid in the first place." 209 U.S. at 450, 28 S.Ct. at 580. (emphasis added)
When Justice Holmes wrote that a statute of repose designed to cure the defective transfer of sovereign lands relates to the "purport and source of the document, not its legal effect" and that after the accrual of the period of repose the patent is "to have the same effect . . . that it would have had if . . . valid in the first place" he expressed the Court's intention that all patents and transfers, even those which may be said to be in violation of prohibitory law, are rendered unassailable after accrual of the period of repose. What is meant by this is that the statute of repose confers elements of confirmation and ratification on the part of the sovereign. The same logic was applied by this Court in State v. Sweet Lake Land and Oil Co., 164 La. 240, 113 So. 833 (1927), where Chief Justice O'Niell wrote for a unanimous Court:
"`Conceding that the Governor of the state and the register of the land office were without authority to issue the patents, the Legislature had authority to ratify and confirm their acts, as was done by the statute of repose. As was said of a similar statute of limitations enacted by the Congress of the United States, in United States v. Chandler-Dunbar Water Power Co., 209 U.S. 447, 28 S.Ct. 579, 52 L.Ed. 881:
"`"The statute presupposes an instrument that might be declared void. When it refers to `any patent heretofore issued,' it describes the purport and source of the document, not its legal effect. If the act were confined to valid patents it would be almost or quite without use."' Atchafalaya Land Co. v. F. B. Williams Cypress Co., 146 La. 1047, 84 So. 351, 258 U.S. 190, 42 S.Ct. 284, 66 L.Ed. 559. See also Atchafalaya Land Co. v. Dibert, Stark & Brown Cypress Co., 157 La. 689, 102 So. 871.
"It is argued on behalf of the state that the Act 62 of 1912 was intended to ratify and confirm only patents voidable for informalities or irregularities but not absolutely null, and that the patents which were issued to J. B. Watkins, as far as they purported to convey title for the bed of Sweet Lake, were null ab initio. Conceding, for sake of argument, that the bed of Sweet Lake was not subject to sale under the provisions of section 11 of Act 75 of 1880, as sea marsh, subject to tidal overflow, at 12½ cents per acre, nevertheless the patents were signed by the Governor and by the register of the state land office, and were recorded in the state land office, and purported to convey an area of land described so as to embrace the bed of the lake, and that is all that the act of the Legislature required in its declaration that such patents should be deemed valid and unassailable after 6 years."
In this respect, it is noted that the United States Supreme Court has reviewed and upheld Louisiana's statute of repose in Atchafalaya Land Company v. F. B. Williams Cypress Company, 258 U.S. 190, 42 S.Ct. 284, 66 L.Ed. 559 (1922). Other decisions to the same effect are Stockley v. United States, 260 U.S. 532, 43 S.Ct. 186, 67 L.Ed. 390 (1923); United States v. Oregon Lumber Co., 260 U.S. 290, 43 S.Ct. 100, 67 L.Ed. 261 (1922) and United States v. Coronado Beach Company, 255 U.S. 472, 41 S.Ct. 378, 65 L.Ed. 736 (1921). The interpretation of statutes of repose is therefore well established.
In Atchafalaya Land Company v. F. B. Williams Cypress Co., 146 La. 1047, 84 So. 351 (1921), an effort was made to annul twelve patents of swamp land claimed by the Atchafalaya Basin Levee District. Defendants relied upon the 1912 statute of repose asserting that the six-year period of prescription had tolled and its titles were unassailable. Although the case did not involve water bottoms, it did involve a transfer that was unauthorized and allegedly an absolute nullity. The nullity arose from the fact that the State *601 had transferred the same land to the Atchafalaya Basin Levee District prior to the issuance of the twelve questioned patents.
Alluding to the rule of interpretation announced in the Chandler-Dunbar Case, this Court held:
"Counsel for the plaintiff and interveners argue that the patents in contest were absolutely null, not susceptible of confirmation by a statute of repose, because the officers who signed and issued them were without authority to do so, after the enactment of the statute creating the levee district in which the lands were embraced. The answer is that the patents were in the form described by the statute of limitation; that is, they were `duly signed by the Governor of the state and the register of the state land office, and of record in the state land office." Conceding that the Governor of the state and the register of the land office were without authority to issue the patents, the Legislature had authority to ratify and confirm their acts, as was done by the statute of repose." 84 So. at 358.
The decision was affirmed by the United States Supreme Court. 258 U.S. 190, 42 S.Ct. 284 with this declaration:

"The act of prescription was a proper exercise of sovereignty. The state could recognize, as it did recognize, that there might be claims derived from it, asserted or to be asserted, rightfully or wrongfully, involving conflicts which should be decided and quieted in the public interest, and therefore enacted the statute. And such is the rationale of statutes of limitations. They do not necessarily lessen rights of property or impair the obligation of contracts. Their requirement is that the rights and obligations be asserted within a prescribed time. If that be adequate, the requirement is legal, and its justice and wisdom have the testimony of the practices of the world."

Other decisions have followed this construction of the 1912 Act of repose. See Atchafalaya Land Co. v. Dibert, Stark & Brown Cypress Co., 157 La. 689, 102 So. 871 (1925); Realty Operators v. State Mineral Board, 202 La. 398, 12 So.2d 198 (1942). In this latter case the Court reaffirmed the doctrine upon which the Price Case was later to be based, saying:
"It was not until the enactment of the Constitution of 1921 that the people themselves forbid, in section 2 of Article IV, the Legislature from alienating or authorizing the alienation of the fee of the bed of any navigable stream, lake or other body of water, except for purposes of reclamation. * * * In interpreting that constitutional limitation, this Court has decided that it operates prospectively only and does not apply to conveyances of mineral rights prior to the enactment of the Constitution of 1921. (Citations Omitted) The same observations are pertinent to a patent issued by the State prior to 1921 under which the bed of a navigable fresh-water lake has been conveyed.
"Moreover, if there be any doubt respecting the validity of the patents insofar as they transfer title to the bed of Lake Hatch, the decision of this court in State v. Sweet Lake Land & Oil Co., supra, fully disposes of any right the State or these defendants may have had to question legality of the title. There, it was held that any patents issued by the State to beds of lakes or other bodies of water which might have been subject to annulment were fully ratified and confirmed by the failure of the State to bring a suit to vacate or annul the patents within six years from the date upon which Act No. 62 of 1912 went into effect." 202 La. at 401, 12 So.2d at 203 (emphasis added).
These same issues were again presented in Humble Oil & Refining Co. v. State Mineral Board, 223 La. 47, 64 So.2d 839 (1953), where the title to Duck Lake was in dispute. The contested property was the bed of a navigable lake which was transferred *602 by the State to the Atchafalaya Basin Levee District which, in turn, sold it to plaintiff's ancestor in title in 1901. The State argued that the lake bed was navigable and could not be transferred to the Levee District. Relying on Act 62 of 1912 the Court held:
"By an unbroken line of jurisprudence, this Court has held that the failure of the State to institute suit to annul a patent or transfer of land by one of its subdivisions within six years from its date, or within six years from the effective date of Act 62 of 1912 when the patent or deed had been executed prior to its passage, operates as a tacit confirmation which thereafter renders the title unassailable. (Citations Omitted.)
"Counsel for the State acknowledge the force of these pronouncements but it is professed that they are inapplicable in this instance for the reason that, in the cited cases, the Court was dealing with lands which the State had been authorized to sell, whereas, here it is contended that the State could not transfer the bed of navigable waters * * *." 64 So.2d at 840.
The Court went on to respond to the proposition asserted by the State by holding that:
"* * * inasmuch as this property was taken out of the public domain by conveyance of said Levee District to private parties, it is a matter of no importance whether the deed of the public officers was beyond the powers vested in them by Act No. 97 of 1890. The transfer being an accomplished fact and the property having been acquired by private transferees, the State was accorded six years to contest the matter. Failure to institute suit within that time constituted a ratification of the action of its officers in disposing of the property." 64 So.2d at 841.
It was not until our decision in California Co. v. Price, 225 La. 706, 74 So.2d 1 (1954), that doubt was cast upon the scope and effect of Act 62 of 1912 by dissenting opinions. Thus 42 years after the Act of 1912, when that Act and the decisions of this Court had set at rest the defects and invalidity of the many transfers by the State and its subdivisions, the whole concept was called into question upon the tenuous assertion that Act 62 of 1912 did not mean what it clearly saysthat the legislature did not intend that it should have the effect it expressed or the effect the many decisions of this Court attributed to its clear and explicit language.
The effect that a reversal of this State's expressed policy in the Act and the many decisions of this Court will have upon valuable property rights long ago vested is easily understood.
In this respect it is important to remember, and the inference is readily evident from a study or the contemporary legislation of the time and the State's history, that prior to 1910 Louisiana had reached a stage of limited development. Vast undeveloped acreage remained the property of the State producing no revenue, liable for no taxes and making no contribution to the State's development and progress. Oil had not yet become an important product of Louisiana's commerce and the lure of the wealth it was to bring was not yet an influence upon the State's policy. Other considerations occupied our lawmakers. It was important to the State's economy that these vast undeveloped areas be transferred to private ownership for development and to enhance the State's tax revenue.
It was, therefore, in this climate that Louisiana conveyed the land in the instant case. It was in this atmosphere, also, that Act 62 of 1912 was enacted. Undoubtedly the statute of repose was made necessary by a multitude of faulty patents and transfers which effectively took the property conveyed by the State and its subdivisions out of commerce. The statute of repose was the obvious answer to cure these defects and permit these titles to be perfected *603 and returned to commerce. In reliance upon this statute, the vast areas affected have been developed by private owners to the benefit of the State and the private parties involved.
It was not until later, when the development of oil, gas and other minerals touched upon these properties that the State's policy was changed by the enactment of Article IV, Section 2, of the Constitution of 1921 declaring: "Nor shall the Legislature alienate, or authorize the alienation of, the fee of the bed of any navigable stream, lake or other body of water, except for the purposes of reclamation." Aside from recognizing reclamation as an exception to the prohibition (these lands were sold to promote reclamation), it is implicit in this exception and in the prohibition itself that prior patents and transfers were not to be disturbed. The State's change of policy, prompted by the lure for oil, cannot retroactively affect the Carmadelles. It is my view that the Price Case is sound and the decision should be affirmed. Its rationale is binding here, and the sale of water bottoms in this case was ratified and confirmed by Act 62 of 1912.
Various technical objections have been advanced by the State to the patent issued by the State to Baker in 1911. Principally it is said that the patent is void because it is not signed by the Register of the State Land Office as Act 62 of 1912 requires. However, the patent is signed by the Governor, as the Act requires, and he has caused the seal of the Register to be affixed. Although this technical deficiency may be considered insubstantial, the Court need not rely upon the "patent" to permit the Carmadelles to avail themselves of the benefits of the Act of 1912. The Act additionally provides that it shall apply to "any transfer of property by any subdivision of the State." The transfer contemplated by this language of the Act need not be perfect in all respects. It is the very essence of a statute of repose that it set at rest the defects and deficiencies of the transfers themselves, the authority for their execution and that it approves the character of the property transferred. Otherwise such a statute would serve no purpose, it would settle nothing and its objective would be defeated.
In the instant case the quoted transfer from the Levee District to Baker definitely purports to be a "transfer". Though it may not comply in all details with the requirements of law, it is a good faith transfer at public auction for a valuable consideration. The fact that the patent later issued is, arguably, technically deficient does not militate against the statute's expressed intention to quiet the title to "any transfer" by a subdivision of the State after six years. Here the actual transfer was accomplished by the Sheriff's deed, the patent later issued was designed to confirm the transfer.
Moreover, as recited above, public notice to all concerned that Baker claimed title to this property was evident by its early recordation the day after the patent was issued. Due to the many years the patent has remained of record, its existence or authenticity may no longer be questioned. La.R.S. 13:3727. Throughout the years the parties owning interests in these properties have exercised the rights of ownership, paid taxes, redeemed the property from the State because of tax sales, sold and conveyed to others in the chain of title and executed the oil and gas lease which resulted in the production of minerals which has provoked this litigation. Until this happened, the State never questioned their ownership. Nothing in the record impugns their good faith.
Another contention advanced by the State is that when the property was sold at tax sale in 1917 for the nonpayment of 1916 taxes the title to the property was vested in the State subject to the right of redemption. Thereafter, in 1921, when the Constitution was enacted prohibiting the alienation of the beds of navigable waters (La.Const. Art. VI, ¶ 2) the property had not yet been *604 redeemed and title was in the State. Water bottoms, therefore, could not be "alienated" under the 1921 Constitution and the redemption in 1938 was a nullity.
This contention has no merit. The tax sale vested title in the State subject to the owner's right of redemption. Exercise of the right of redemption was not an "alienation" as contemplated by the Constitution which specifically recognizes that the "owner or other person having the right to redeem may buy or redeem property sold or adjudicated to the State for taxes." In such a redemption the constitution does not permit the State to reserve mineral rights. La.Const. Art. IV, ¶ 2. When the right to redeem is exercised before the State has made an outright alienation of the tax property to third parties, all rights vested in the tax debtor at the time of the tax sale are redeemed. State ex rel. Hyams' Heirs v. Grace, 197 La. 428, 1 So.2d 683 (1941).
Nor does Article VI, Section 2, amount to "dedication" of these lands to the State, as it contends, so that an alienation took place at the time of its enactment denying the tax debtor the right of redemption. Because the constitution recognizes the right of redemption, and because the constitutional provision is not a "dedication", the argument has no merit.

Act 727 of 1954
Following the decision in California v. Price, the legislature adopted Act 727 of 1954 which was designed to accomplish a retroactive overruling of Price by declaring that Act 62 of 1912 was intended by the 1912 legislature to protect only those defective patents and transfers which did not purport to convey navigable water bottoms. But the Act of 1912 does not so limit its effect as Act 727 of 1954 readily recognizes. Act 727 also purports to nullify all patents and transfers issued or thereafter issued contrary to this declared policy. Act 727 also declared that the public policy of this State he always been to preserve navigable waters and their beds as common or public things insusceptible of private ownership.
This latter statement is inconsistent with the many alienations by the State to the contrary. It is inconsistent with the clauses ratifying and confirming those transfers in the numerous oyster statutes. This latter declaration is an expression of policy evoked by the State's realization of the mineral value of these water bottoms long after they had been acquired by private owners in good faith at a time when the State policy was otherwise. As I have said, at the time of the transfer of the property in the instant case, it was the policy of the State, clearly evident from contemporary law and history, to encourage private ownership of these remote and worthless properties in order that they might be entered upon the tax rolls to provide revenue for the State and be launched into the mainstream of the State's economy to promote its progress.
Besides these considerations, Act 727 of 1954 is patently unconstitutional in its purport to divest vested rights and its attempted intrusion into the realm of the judicial function. La.Const. Art. IV, ¶ 15 and Art. II, ¶¶ 1 and 2. The principle of separation of powers is the cornerstone of our State and federal systems of government. In the very beginning of our Nation Chief Justice Marshall announced the role of the judiciary in these words: "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases must of necessity expound and interpret that rule." Marbury v. Madison, 1 Cranch 137 (5 U.S. 137, 1803), 2 L.Ed. 60.
Our Court has observed this basic constitutional principle in a variety of instances. It has been expressed in these meaningful words:
"To interpret laws is not a legislative, but a judicial function, and this fundamental rule of constitutional law has not only been uniformly observed in the *605 pronouncements of the courts of this State but has been enunciated by the highest tribunals in numerous other States." Licensing Board of Contractors v. State Civil Service Commission, 240 La. 331, 123 So.2d 76 (1960).
Every contention made by the State has been analysed in this dissent and found wanting. The variety of issues presented demonstrates that the State had no confidence in the wisdom of overruling the Price Case and the many decisions applying Act 62 of 1912. In doing so the majority opinion solves nothing. To the contrary, by approving this turnabout the Court invites another Court on another day to return to the sounder and more plausible rule of the Price Case. All of which will cause the owners of property within this State to wonder about the stability of their titles.
I respectfully dissent.
NOTES
[1] In placing our decision on the ground that the prescriptive statute is inapplicable, we do not imply that the other grounds advanced for affirming the judgment may not have merit. We do not reach them.
[1] 1 Louisiana Legal Archives, Project of the Civil Code of 1825 at 41 (1937).
[2] While the first three articles may have had several sourcesDomat, The Institutes, the Digest, Las Siete Partidas and article 538 of the Code Napole onthe last three articles are very definitely derived from Toullier, Le droit civil francais, Tome Troisie me, Liv. II, tit. I, Chap. III, n. 38, 39 at 27 (1839).
[3] The logic of the analogy is apparent. The public interest protected by designating navigable rivers as public things is the free use of navigable waters for transportation and other commercial purposes. If that interest justifies vesting the ownership of the beds of navigable rivers in the State, as it has in Louisiana, the same rule should apply to other navigable water bottoms. Yiannopoulos § 32 at 90 et seq.
[4] For a discussion of the improper reliance made by the Court in Price upon other inapposite decisions, see the learned and comprehensive dissent in that case by Justice Hawthorne, 74 So.2d 17, 24-27.
[5] Mr. Justice Holmes, after describing the land under consideration as "public land" and "in kind open to sale and conveyance by the Land Department," stated that since the United States had power to issue the patent and to validate it, it was of no moment that the President had not been authorized to give the patent. He correctly notes that void instruments are the kind of instruments which the statute purports to make valid. If the United States had authority to divest itself of title to the land in question, then any act or omission which would have subjected the patent to being declared void and annulled was cured by the lapse of time provided in the statute of limitations. The prerequisite to the effectiveness of the statute of limitations in the federal act is a patent issued on lands which the United States had power to dispose of under Acts of Congress or the Constitution. A judicial act purporting to alienate that which was inalienable was, because of the very fact of the inalienability, incapable of being validated because it was more than merely invalid. It was in effect an act transferring nothing and creating nothing.
[6] It should be noted that under the public trust doctrine as enunciated in Illinois Central Ry. Co. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 118, 36 L.Ed. 1018 (1892), Act 727 of 1954 would be valid whether classified as interpretive legislation or not, since in that case the United States Supreme Court allowed the legislature to repeal a grant of public lands to private individuals because it violated the public trust.
[1] These articles provide:

"Art. 450. Things, which are common, are those the ownership of which belongs to nobody in particular, and which all men may freely use, conformably with the use for which nature has intended them; such as air, running water, the sea and its shores."
"Art. 451. Sea shore is that space of land, over which the waters of the sea spread in the highest water, during the winter season."
"Art. 452. From the public use of the sea shores, it follows that every one has a right to build cabins thereon for shelter, and likewise to land there, either to fish or shelter himself from the storm, to moor ships, to dry nests, and the like, provided no damage arise from the same to the buildings and erections made by the owners of the adjoining property; provided however, that where a sea shore is within the limits of an incorporated city or town, such sea shore shall be subject to the police power of such city or town as set forth in its charter, and no cabins or other structures shall be built on such sea shore or in the waters adjacent thereto except upon such conditions as the city or town may prescribe."
"Art. 453. Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation: of this kind are navigable rivers, seaports, roadsteads and harbors, highways and the beds of rivers, as long as the same are covered with water.
"Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads, and harbors."
"Art. 482. Among those which are not susceptible of ownership, there are some which can never become the object of it; as things in common, of which all men have the enjoyment and use.
"There are things, on the contrary, which, though naturally susceptible of ownership, may lose this quality in consequence of their being applied to some public purpose, incompatible with private ownership; but which resume this quality as soon as they cease to be applied to that purpose; such as the high roads, streets and public places."