650 So.2d 777 (1995)
ARKLA EXPLORATION COMPANY
v.
DELACROIX CORPORATION, et al.
Nos. 94-CA-0664, 94-CA-0665.
Court of Appeal of Louisiana, Fourth Circuit.
January 19, 1995.
Rehearings Denied March 14, 1995.
*778 Hugh M. Wilkinson, Jr., Wilkinson & Wilkinson, New Orleans, for appellee Delacroix Corp.
M. Hampton Carver, Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux New Orleans, for appellants William Skully, Robin F. Skully, Charlotte Hillyer Dupuy, and Hayward H. Hillyer, Jr.
Michael A. Britt, New Orleans, for defendants/appellants Herbert E. Diaz, Allen D. Diaz, Delores Diaz Davidson and Lorraine Diaz Haffner.
Richard P. Ieyoub, Atty. Gen., Gary L. Keyser, Asst. Atty. Gen., David C. Kimmel, Asst. Atty. Gen., Baton Rouge, for appellant State of La.
Jackson M. Cooley, Houston, TX, for AMOCO, Production Co.
John F. Wadsack, The Carmouche Law Firm, Lake Charles, for appearers.
William Timothy Allen, III, J. Jay Caraway, Blanchard, Walker, O'Quin & Roberts, Shreveport, for appellant Seagull Mid-South Inc.formerly Arkla Exploration Co.
Glenn L. Langley, Julia E. Blewer, Cook, Yancey, King & Galloway, Shreveport, George Pivach, II, Jefferson D. Honeywell, Pivach & Pivach, Belle Chasse, for appearers.
Before WARD, JONES and WALTZER, JJ.
JONES, Judge.
Several parties appeal the trial court's judgment in these consolidated concursus proceedings brought by Arkla Exploration Company relative to royalties from oil, gas and/or mineral leases located at the Lake Petit waterbottom.
We adopt the trial court's findings of fact in part as reproduced herein:
The evidence reveals that in 1895 the State transferred full government sections of 640 acres each to the Lake Borgne Levee District. In 1902 the Levee District also conveyed the property as full governmental sections. There was no exclusion for a lake bed. If the lake then existed it was purportedly transferred into private hands. It was not until 1927 that Delacroix became the record owner of all of Sections 20, 21, 28 and 29 of T158, R14E, Southeastern Land District, East of the Mississippi River, in Plaquemines Parish.
Delacroix admits that after it obtained the referenced sections in 1927 it conveyed certain subdivided lots from them. This is the source of the present ownerships of Diaz and Gallardo. However, the record *779 title of the balance of the governmental sections, marsh and lake bed, remains in Delacroix. Delacroix has not alienated any part of Lake Petit.
In 1983, Arkla Exploration Company filed two concursus suits, consolidated herein, as the holder of royalties owed under the terms of oil and gas leases which Arkla owned and operated. The oil and gas leases had been granted over properties claimed by competing groups made defendants in the instant suit; the State of Louisiana and its overriding royalty owners and Delacroix Corp., the Gallardo claimants and the Diaz claimants. The maximum royalty portion owed by Arkla from the production for each of the two unitized wells in dispute was 25%. Arkla deposited 25% of the revenues attributable to production from each of the disputed units. Arkla requested that it receive a refund to the extent that judgment might be rendered in favor of claimants entitled to royalties less than 25%. Absent the possibility of a refund, Arkla remained a disinterested stakeholder. The royalties amounted to $102,761.93 in the first proceeding and pertain to State Lease 8565 (B.H. 11550 RA SUA) effective November 17, 1981. The royalties in the second proceeding amount to $60,715.24 and pertain to State Lease 8564 (B.H. 1200 RA SUA) effective October 6, 1982. The state leases have expired by their own terms and are kept in full force and effect by various operating agreements.
Pursuant to a joint motion by Delacroix and the State, the trial court bifurcated trial of this matter and trial was limited to issues of rights of ownership of the disputed area. Issues relative to mineral royalty rights were reserved for a later date.
At trial the State claimed the transfers from the Lake Borgne Basin Levee District are subject to reformation to exclude the lake bottom, asserting that the lake was a navigable waterbottom in 1812 (the date upon which Louisiana was admitted into the union and thus gained ownership of the disputed area pursuant to its inherent sovereignty), and also that, if the lake was not navigable in 1812, it was within the ebb and flow of the tide. Alternatively, the State claimed that Lake Petit was navigable in 1902 (the date upon which the levee district conveyed the disputed area into the private domain). Delacroix refuted claims that the lake was navigable in either of those years and further argued that the six year peremption or prescription of Act 62 of 1912 bars the State from attacking the transfers even if the lake was navigable.
The trial court dismissed the claims of the State of Louisiana holding that Lake Petit was non-navigable and remote from tidal ebb and flow in 1812. It further found it unnecessary to determine whether the lake was navigable in 1902 because Act 62 of 1912 barred any attack by the State on the Levee District conveyance following six years after the adoption of Act 62. The trial court recognized the rights of Delacroix Corp., the Gallardo claimants and the Diaz claimants to portions of land and waterbottoms within two (2) unitized areas and fixed percentage of revenues due each based on ownership.
The State of Louisiana filed the initial appeal. Its overriding royalty owners have joined in its appeal or stipulated to its interests. The Diaz claimants and Arkla Exploration Corporation have also filed appeals.

APPEAL OF THE STATE OF LOUISIANA
The State of Louisiana and several royalty owners appeal the trial court's judgment finding that Lake Petit and adjacent marsh lands are the private property of defendants Delacroix Corp., the Gallardo claimants and the Diaz claimants. Specifically, the State raises three assignments of error: 1) the trial court erred in assuming that in order for the State to prevail it must determine that the entire passage of the disputed waterway was navigable; 2) the trial court erred in weight given to the evidence; specifically by ignoring and discounting (a) the reference to Lake Petit on an 1806 Lafon Map, (b) an 1816 map commissioned by Darby, and (c) an 1842 Graham reconnaissance; and 3) the trial court erred in applying Act 62 of 1912, known as the Statute of Repose, thereby partially overruling Gulf Oil v. State Mineral Board, 317 So.2d 576 (1975). We discuss each of the State's assignments of error in the order that it was presented.

*780 Navigability
Navigability is a question of whether a waterbody is capable of sustaining commerce. Ramsey River Road Property Owners v. Reeves, 396 So.2d 873 (La.1981). It has been interpreted broadly but is a question of fact. Both sides offered testimony and evidence to support its position on navigability of the waterbody. In its reasons for judgment the trial court wrote that it relied on the geomorphological history of Dr. Sherwood Gagliano and the 1817 military survey of General Bernard, both of which showed that Lake Petit was not navigable in 1812. The trial court also relied on government surveys in 1842 which reflect impassible marsh. In fact the trial court observed that depth soundings in 1902 indicate the area was still not navigable. The trial court concluded that if the waterbody, which consisted of adjoining formations (River Aux Chenes, Orange Bayou, Grand Lake, Alligator Pass, Lake Petit, Bayou Gentilly, and Bayou Terre Boefs), was not navigable for its length it was not navigable in fact. In so doing the trial court appears to be clarifying that not only was the waterbody not capable of commercial use but it also was not subject to tidal ebb and flow.
We find no error with the trial court's ruling. Each side presented competing expert testimony over the course of this seven day proceeding. The testimony by Delacroix's experts, Dr. Gagliano and his associate, was very impressive. Repeatedly Dr. Gagliano cites language in historical documents which describe the Grand Lake/Lake Petit complex as isolated freshwater marsh. Dr. Gagliano did not limit his testimony to interpreting historical maps and reports but also testified within his expertise as a geologist, geomorphologist and archaeologist. Through his background we learn about the vegetation, wildlife and accessibility to use by man of this region.
Into the early 1900's the area was still no more than a narrow channel clogged by vegetation with dense overhanging vegetation which served as a canopy to block out the sun. Dr. Gagliano's associate, Dr. Wicker, an expert geographer, testified that the area remained fresh water until the 1920's. She relied in part on the emergence of a vital muskrat trapping industry in the area to reach this conclusion. A vital trapping industry depends on freshwater. She further testified that the area was not amenable to commercial fishing until the 1930's which corresponds with the date of the first oyster lease in this area. That is because the type of fish popular on the commercial market reddish, trout, large crabs, croaker, and flounderneed a wide range of salinity to thrive. Dr. Gagliano testified that minor fluctuations of water levels related to the tide do not change the isolated character of Lake Petit. This tidal fluctuation is on a seasonal basis as opposed to a daily basis and despite the resulting salinity, which is barely measurable, the area would still be classified as freshwater.
Dr. Gagliano concluded that the area was relatively unchanged for a hundred years and then, contemporaneous with coastal erosion throughout southern Louisiana, it experienced a dramatic increase in subsidence during modern historic times (1940present).
Robert Ancelet, an investigator with the State Wildlife and Fisheries Commission, conceded that he thought the area was formerly freshwater. He relied on the deposition of 94 year-old Alcide Campo who stated that as a child he fished in the Lake Petit area with his father and that bullfrogs and alligators populated the area. Bullfrogs and alligators are native to freshwater marshes. All of the witnesses from the State Wildlife and Fisheries Commission testified that even today one must use vessels with less than two and a half foot draft to traverse the area around Lake Petit. We find no manifest error with the trial court's ruling.

Evidentiary Findings
The trial court also wrote in its reasons for judgment that it found that Father Gravier's passage in 1700 was a different course and thus not relevant to this inquiry. Dr. Charles Coates, expert civil engineer for the State, relied on a retelling by Maurice Reis of Father Gravier's trip from Illinois to Fort Mississippi and Fort Biloxi. This retelling seemed to indicate that an unnamed lake, *781 which Mr. Reis concluded was Grand Lake/Petit Lake, used by Father Gravier was interconnected with the waterbodies adjoining the forts. However, Delacroix recalled Dr. Gagliano as a rebuttal witness and Dr. Gagliano testified that Mr. Reis' retelling was flawed in that Father Gravier would not have travelled northwest to reach a destination that was southeast. Dr. Gagliano had obtained a direct translation of Father Gravier's writings to determine what course he took. More probable than not the lake that Father Gravier used to reach the forts was Black Lake, a singular lake, rather than Grand Lake/Petit Lake, a two-lake complex. We do not find that it was error for the trial court to adopt Dr. Gagliano's opinion on this issue.
The trial court also found Darby's geographical description not to be reliable because it was incredible to believe that Darby could have surveyed the expanse of area in the time frame he indicated and his descriptions of one rather than two water formations was not accurate. This was not error. Darby's description of the area was very inconclusive in terms of the existence of the two-lake complex. Furthermore, Dr. Gagliano pointed out that cartographers of the period were somewhat unsophisticated. They often relied on older maps and failed to detail the maps with features of the landscape. Darby visited the area in 1816.
Finally, the trial court wrote that the 1842 reconnaissance was insufficient to show navigability. We agree. Graham wrote that the area was of no use for his purposes. Because this was a Civil War reconnaissance one can assume it was of no use for the transport of soldiers or supplies. Dr. Coates interprets Graham's report to suggest that the area had both commercial and military value. He relies on the existence of oak trees and a population of fishermen 5-10 miles away and the speculation that the waterbodies would afford passage to New Orleans. However, there is no evidence of a timber industry or a fishing industry in the Lake Petit area in 1902 or before. In the absence of manifest error we defer to the fact finder on the issue of navigability.

The Statute of Repose
The State of Louisiana insists that the trial court erred in interpreting Humble Oil and Refining Company v. State Mineral Board, 223 La. 47, 64 So.2d 839 (1953), "The Duck Lake Case", and Realty Operators v. State Mineral Board 202 La. 398, 12 So.2d 198 (1943) as creating a distinction to Gulf Oil, supra in that the Statute of Repose is applicable to inland navigable lakes. The State argues that this misinterpretation is obvious from a review of statutory law, La.R.S. 9:1107-1109 and commentary relative to navigable waterways being "public things". See: Yiannopoulous, Civil Law Treatise, Property 3d Ed., Section 68 at page 127 (1991).
The court in Gulf Oil relied on La.C.C. articles 449 and 450 relative to a sea coast being a common thing. Under La.C.C. articles 481 and 482, common things are "... not susceptible of ownership and can never be the object of it ..." Delacroix argues that the holding in Gulf Oil is inapplicable to a fresh marsh, shallow lake.
Delacroix asserts that the opinion in Gulf Oil deviates far from the law when it refers to "navigable waters." Delacroix relies on Phillips Petroleum v. Mississippi, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988) in arguing that there is no bar to alienation of sovereign navigable waterbottoms in Louisiana absent a public trust doctrine for the same in the local law of Louisiana. Realty Operators and Duck Lake confirm that no such public trust doctrine exists in Louisiana.
First, this Court has previously addressed this issue in Delacroix Corporation v. Jones-O'Brien, Inc and Martin Exploration Company, 597 So.2d 65 (La.App. 4th Cir.) writs denied 604 So.2d 1303 (La.1992) distinguishing Gulf Oil. Second, it is abundantly clear from the record that until the 1920's when a muskrat trapping industry emerged, that this area remained non-navigable, freshwater marsh with no commercial value.

APPEAL OF THE DIAZ CLAIMANTS
The Diaz claimants appeal the trial court judgment's erroneous allocation of ownership *782 between itself and Delacroix Corp. The Diaz claimants argue that the trial court erred in assigning two tracts owned by the Diaz claimants to Delacroix. Furthermore they argue that the trial court failed to recognize the right to ownership of the heirs of Alvin Diaz, now deceased.
Delacroix argues that the Diaz claimants are precluded from contesting ownership of tracts because they did not assert this claim at trial.
The Diaz claimants refer to evidence introduced at trial that establishes their ownership of two additional tracts. Contrary to the allegations of the Diaz claimants, this evidence reflects that Delacroix Corporation is the owner of the disputed tracts.
The Diaz claimants failed to offer proof for the record that they owned the tracts in dispute. However, succession documents comprise part of the Diaz exhibits offered at trial. Therefore the trial court's judgment is amended to reflect the present owners/judgment creditors.

APPEAL OF ARKLA EXPLORATION CO.
Arkla Exploration Co. appeals the trial court's judgment ordering an accounting to defendants and rendering an indefinite judgment. Arkla Exploration Company raises three assignments of error, specifically that 1) the trial court erred by failing to assign a percentage of the royalty fund to each claimant and relieving Arkla of all further liability; 2) the trial court erred by ordering Arkla to perform an accounting where no deficiency was shown; and 3) the trial court erred by subjecting Arkla to further liability by rendering an indefinite judgment. Essentially these are all the same argument so we address them en globo.
La.C.C.P. articles 4652 and 4656 relative to concursus proceedings do not limit the issues which can be raised in a concursus proceeding. The proceeding is broadly defined as "... one in which two or more persons having competing or conflicting claims to money, property, or mortgages or privileges on property are impleaded and required to assert their respective claims contradictorily against all parties to the proceeding." Delacroix makes the distinction that this concursus proceeding was over property rights to ongoing lease royalties and not money deposited into the registry of the court. Delacroix argues that it is entitled to an accounting. Delacroix's distinction is no more than a dispute over nomenclature. Having failed to serve any cross claims or reconventional demands the dispute was over the lease royalties as defined by Arkla.
Arkla argues that as stakeholder it was incumbent on it to define the scope of the action. However, it became the burden of defendants to dispute the scope of action as defined and Delacroix failed to do so. Amoco v. Carruth, 457 So.2d 797 (La.App. 1st Cir.1984), Mary Adams and Associates v. Rosenblat, 539 So.2d 860 (La.App. 5th Cir. 1989). The Adams case suggests that a trial court in a concursus proceeding is limited to amounts on deposit absent any properly served pleadings which may have the effect of enlarging the court's monetary judgment.
It is revealing that in answer to Arkla's petition, Delacroix at no time accepts its allegations regarding royalty amounts to be placed in escrow. Arkla suggests that Delacroix intended to challenge the royalty amounts in a separate litigation which is still pending in the trial court. Upon inquiry by this Court it was revealed that only a petition and answer have been filed in that matter. In light of the Adams case we agree with Arkla that the trial court exceeded its jurisdiction in ordering an accounting, thus subjecting Arkla to an indefinite judgment. Delacroix was not entitled to an accounting or any additional monetary award because it failed to plead a deficiency.
For the foregoing reasons, the trial court's judgment is amended to reflect that the heirs of Alvin Diaz assume ownership of the interest assigned to him. We reverse that part of the judgment requiring Arkla to perform an accounting to defendants. Claimants take what royalty funds were deposited in the registry in accordance with their interests as determined by the trial court.
REVERSED IN PART, AND AMENDED AND AFFIRMED IN PART, AS AMENDED.
*783 WARD, J., concurs with reasons to follow.[*]
NOTES
[*] Judge Ward, who retired December 31, 1994 initialed and approved this opinion prior to his retirement.